**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**

| | | |
|---|---|---|
| **Courtney Morgan, M.D.**, | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | |
| | § | Case No.: 0:24cv61442 |
| **Walgreen Co.**, | § | |
| *Defendant.* / | § | JURY |

---

### VERIFIED COMPLAINT

---

**COMES NOW**, Plaintiff, Courtney Morgan, M.D., by and through his undersigned counsel, and files his *Verified Complaint* seeking monetary damages in excess of $500,000, exclusive of costs, interest an attorneys' fees, and a *Temporary Restraining Order, Preliminary Injunction* and *Permanent Injunction* against Defendant, Walgreen Co., and alleges and states:

### JURISDICTIONAL ALLEGATIONS

1. This Court has jurisdiction over this matter because of diversity of citizenship between the parties, the amount in controversy, exclusive of interest and costs, exceeds seventy-five thousand dollars ($75,000), and jurisdiction is therefore proper pursuant to 28 U.S.C. §1332.

2. Venue is proper in this Court pursuant to 28 U.S.C. §1391(a), because it is the Judicial District in which substantial events that have given rise to this *Verified Complaint* occurred.

### PARTIES

3. Courtney Morgan, M.D. [hereinafter Dr. Morgan or Plaintiff] is a resident of the State of Florida, domiciled in Palm Beach County, Florida.  At all times relevant herein, Dr. Morgan is and has been authorized to transact business and licensed to provide medical services within the State of Florida, individually as a physician as well as in association with his medical practice, Hop Medical Services, PLLC, which is located within Broward County, Florida.

4. At all times relevant herein, Walgreen Co., [hereinafter Walgreens] is and has been an Illinois corporation whose principal place of business is located in Deerfield, Illinois.  Walgreens has stores and pharmacies throughout the state of Florida and the United States of America.

### GENERAL ALLEGATIONS AND FACTS COMMON TO ALL COUNTS

5. Dr. Morgan is licensed physician within the State of Florida.  He obtained a resident's license on June 24, 2004, and his full unrestricted physician's medical license on June 20, 2006.

6. On or about August 16, 2006, Dr. Morgan established his medical practice, Hop Medical Services, PLLC [hereinafter Hop Medical], as a Family Medicine Clinic.  He has always been the sole owner and operator of this practice.

7. Dr. Morgan trained in the Family Medicine & Community Health residency program at the University of Miami/Jackson Memorial Medical Center. This training encompassed extensive exposure to pain management, which was an essential medical need for patients with various comorbidities, such as sickle cell crises, traumatic injuries, cancer, neuropathies, HIV/AIDS, uncontrolled diabetic neuropathies, peripheral vascular diseases, back and joint pain, migraines, fibromyalgia, post-surgical pain, and various neurological conditions.

8. Although renewal of a Florida medical license requires 40 hours of Continuing Medical Education (CME) every 2 years, Dr. Morgan has completed a total of 171 credits in courses related to prescribing controlled substances within the past 18 months, 98 of which are directly related to chronic pain management.

9. On July 2, 2020, Hop Medical was issued its pain management clinic license from the Florida Department of Health. Dr. Morgan is and has been the sole practitioner, Designated Doctor, and Medical Director for Hop Medical.

10. Dr. Morgan is qualified to own, operate, and prescribe controlled substances in a pain management clinic, pursuant to Florida's laws and administrative rules. Dr. Morgan's Florida medical license and DEA license for prescribing of controlled substances are both current, unrestricted, and active.

**Medical Practice and Patient Population**

11. All Hop Medical patients are treated for chronic (non-acute) pain.  In certain situations, a few patients are also treated for primary care issues.  For example, if a patient does not have or cannot afford regular visits with a primary care physician (PCP), Dr. Morgan will often serve as their PCP until they can establish a PCP.  In addition, Dr. Morgan provides primary care services temporarily if a patient's established PCP is unreachable, or appointments are too far out for the PCP to attend to an urgent situation such as uncontrolled hypertension (HTN), temporary increased anxiety (where patients are usually also being managed by Psychiatry), exacerbated chronic obstructive pulmonary disease (COPD), asthma, congestive heart failure (CHF), and other co-morbid ailments.

12. The clinic's patients are generally referred from other health care providers who recommend continued management of chronic pain for patients with multiple co-morbidities, complex medical problems, failed surgeries and or failed interventional treatments.  In other words, these patients have been in pain management for treatment of chronic pain by either their PCP, specialist or hospital provider, prior to presenting to Dr. Morgan for continuity of medical care.

13. Dr. Morgan's patients are often treated for chronic pain related to long-term medical issues, such as various cancers (prostate, breast, colon, colorectal, metastatic and stage 4 in nature), sickle cell disease, HIV neuropathy, diabetic neuropathy, vertebral degenerative disease (with bulging/herniated discs, fusion, compression, bone spurs, facet narrowing, central canal

narrowing), amputees, rheumatoid arthritis, arterial vasculitis with peripheral vascular disease of lower extremities, traumatic debilitations (resulting from gunshot wound injuries, crushing from heavy objects in accidents, falling from roof/building/ladder/bridge, motor vehicle accidents, sport injuries, bone fractures, etc.). Also, some of his patients have been diagnosed with a terminal illness and are treated for chronic pain within the scope of palliative medicine.

14. All patients who have been accepted into Hop Medical for the management of chronic pain have either received and or are receiving other treatment modalities for interventional pain management. These various interventions include one or a combination of the following: surgeries, paraspinal steroidal injections, radiofrequency ablations, total hip replacement, total knee replacements, discectomy, intramuscular injections (knee, spine, shoulder), rhizotomy, epidurals, chiropractic treatments (spinal manipulation, electrical muscle stimulation, etc.), acupuncture, physical therapy, TENS (transcutaneous electrical nerve stimulation), traction, home care treatments (water exercise, low impact exercises, stretching), heat/cold treatments, braces and stabilizers for knees, back, and wrists, as well as over the county (OTC) medications and topical creams.

**Practice Procedures and Patient Care**

15. Prior to the scheduling a new patient appointment with Dr. Morgan, patient screening is performed where medical and non-medical background information is obtained for the staff and Dr. Morgan's review. Specifically, criminal background searches are conducted, as certain drug-related charges would preclude a patient's admission into the clinic. Relevant medical records are obtained, and preliminary intake forms are also filled out by the patient.

16. At the first appointment, additional patient information and medical history are collected, along with any additional medical records requested by the staff. The patient completes a

comprehensive questionnaire regarding past medical, surgical and family history, including but not necessarily limited to previous providers, failed conservative measures (i.e., physical therapy, chiropractic care, etc.), current medications, failed medications, causative factors for pain, and assessments of how chronic pain affects the patient mentally and socially (i.e., depression, anxiety, mood, sleep, etc.).  The patient's controlled substance prescription history is also retrieved from E-Forcse, the state-maintained database of prescribed controlled substances. All of the foregoing is reviewed prior to the patient being seen by Dr. Morgan.

17. When presenting to Dr. Morgan, the patient undergoes a physical examination conducted only by Dr. Morgan, who also obtains a full history of the patient. Additional diagnostic studies or other tests may be ordered by Dr. Morgan. Using this information, a treatment plan is formulated that may include, rehabilitative therapies (i.e., physical/occupational therapy,) laboratory testing, medication management, specialist referrals (i.e., orthopedists, vascular surgeons, neurologists, nephrologists, podiatrists, therapists, chiropractors, psychiatric and other behavioral health consultations and therapies, etc.), and considerations of non-opioid alternatives (i.e., home care exercises/therapies, adjunctive therapies, interventional treatments, invasive and surgical interventions, etc.).  Both short and long-term treatment goals are set. These weekly/monthly goals are reviewed at each medical visit for progress and achievement.  Every patient is given informational materials regarding non-opioid alternatives.

18. When devising and formulating a treatment plan for a patient, any decision to prescribe controlled substances as part of the treatment plan is based on many different factors that may include the following: information from the referring physician, diagnostic studies and testing, E-Forcse reports, previously prescribed medications including controlled substances, other medications that the patient is prescribed by other specialists, patient opioid risk level, patient

history, age, allergies and various other co-morbidities and conditions as well as the patient's functional history. Treatment plans are generally created with the goal of controlling patient's pain, where the benefit outweighs the risks.

19. After consultation, Dr. Morgan makes a preliminary decision whether to accept the patient and whether to either continue controlled substances therapy as part of a treatment plan and or recommend another or additional avenues for treatment of chronic pain. The patient is educated and counselled about the risks and benefits of the use of opioids and controlled substances and the options for non-opioid alternatives. Patient then has a follow-up appointment in a timeframe as determined by Dr. Morgan, no greater than 28 days, to reassess the patient and effectiveness of treatment.

20. Dr. Morgan has established a rigorous compliance policy where each individual patient's compliance is closely monitored.  Patients are asked to give informed consent to treatment and are required to execute a Treatment Agreement. They are given a summary of the clinic's policies for random urine drug screening and advised of the expectations of compliance with the clinic's policies, the doctor's orders, and cooperation with clinic's compliance officer. "Doctor shopping" is explained as well as the importance of maintaining strict compliance with the Treatment Agreement and the security of their prescribed medications.


**Safeguards Against Diversion and Misuse of Controlled Substances**

21. Safeguards against diversion and misuse of controlled substances implemented by Dr. Morgan includes in part, the following:

A. Review by Compliance Officer: A thorough criminal background check is conducted by the compliance officer on each new patient, screening for drug related criminal history. Medical records are obtained directly from medical providers for verification and clarification of the patient's medical history as well as review for consistency and

authenticity. A patient may be interviewed by the compliance officer to obtain additional information or clarification. All of the foregoing information is reviewed for the purpose assessing the legitimacy of the patient from a non-medical perspective.

B. <u>E-Forcse (Florida's PDMP System)</u>
The e-Forcse system is checked prior to prescribing any controlled substance. A rigorous and methodical review of the E-Forcse report detects whether the patient has engaged, or is engaging in "doctor shopping," whether the patient is taking the medication as prescribed or medication that is not prescribed, and whether diversion is apparent, among other things.

C. <u>Random Drug Test (RDT):</u>  Prominent office postings state that patients must submit to random drug tests for usage of their prescribed medication and illicit drugs. It is also stated that failure to submit to a RDT, adulteration of a specimen, or testing positive for illicit drugs or medications not prescribed may be grounds for immediate discharge from the clinic.  Patients are subjected to random drug tests no less than once every three months, even if the patient is assessed as low or moderate risk for misuse.

D. <u>Treatment Agreement:</u>  All patients enter into a Treatment Agreement, and a summary of same is provided to the patient.  The Treatment Agreement addresses misuse and diversion of medication, and states causes for discharge, which include:

- Patient gives, sells, or misuses the pain medication
- Incarceration due to drug related offense
- Patient attempts to obtain pain medication sooner than next office visit from any other physician, emergency room, or any other source in the absence of a true emergency
- Patient provides false information / false medical records
- Patient fails to keep appointments
- Patient does not subject him or herself to a random urine analysis
- Unsatisfactory test result (i.e., RDT) or failure to obtain recommended/ordered tests
- Allegations, suspicious information or investigation initiated by anyone regarding potential violations of this agreement which is brought to the attention of clinic staff

E. <u>Chart Review & Staff Meetings:</u> Chart reviews are performed quarterly, where if any irregularities are observed, inquiries are made to the patient. For example, if a patient has missed appointments and cannot be reached, the compliance officer may investigate whether a patient has been hospitalized or arrested.[1] Staff meetings are held every month, where any issues with prospective, new or return patients can be raised and addressed. All of the foregoing also provides useful information to prevent medication errors and potentially dangerous drug interactions.

F. <u>Communication with Pharmacists:</u> Dr. Morgan has an 'open door' policy when communicating with pharmacists about the medical care of mutual patients. This open communication not only allows for discussion of the patient's treatment and their clinical

---

[1] Of note, any drug related arrests are required to be disclosed by the patient pursuant to their Treatment Agreement.

stability, but also allows for exchange of information when either the physician or the pharmacist suspects diversion, misuse or doctor/pharmacy shopping.

G. <u>Strict No Refill Policy</u>
Refill authorizations are never given for pain medications. Patients must appear in person for their medical visit for reevaluation every 28 days. Prescriptions are not resent to the pharmacy if medications have been stolen, lost or misplaced.

22. If a patient has failed one of Dr. Morgan's routine compliance surveillance tools, then a decision is made regarding appropriate measures for that individual patient. These measures may include counselling, treatment with other medications, discharging the patient from the practice and or referral to appropriate providers for additional care, counseling, or treatment.

**<u>Florida Department of Health's Random Annual Inspection & Audit Results</u>**

23. Florida Department of Health (DOH) performs a mandatory annual random inspection and audit on all licensed pain management clinics.  The audits consist of a comprehensive review of the medical practice, with visual inspection of the entire facility, current licensures, certificates and permits, daily patient panels, office policies, staff meeting minutes, and random review of medical charts.

24. The clinic has passed every annual DOH inspection and audit since issuance of its pain management clinic license.  ***After review of the clinic's medical charts by the DOH during its most recent random inspection and audit on May 31, 2024, positive findings, in part included*** (See Exh. 1, Florida Department of Health Inspection Results):

- Complete medical history and physician examination, including history of drug abuse and dependence.
- Complete physical exam is performed by the physician on the same day that the physician prescribes a controlled substance.
- Documentation in the patient's record of the reason for prescribing more than 72-hour supply of controlled substances for the treatment of chronic non-malignant pain.
- Clear and complete medical justification for continued treatment with controlled substances

- Steps to ensure medically appropriate use of controlled substances is documented clearly and completely when continuing controlled substance prescribing while waiting on consultant's report on patients showing signs or symptoms of substance abuse.
- Written individualized treatment plan has been developed for each patient with objectives used to determine treatment success. The physician adjusts drug therapy to the individual needs of each patient. Other treatment modalities are considered. Interdisciplinary nature of treatment plan is documented.
- Patients are referred as necessary for additional evaluation and treatment in order to achieve treatment objectives with special attention given to those patients at risk for misuse of medications and those in living arrangements that pose a risk for medication misuse or diversion.
- Patients with signs or symptoms of substance abuse are immediately referred to a board-certified pain management physician, addiction medicine specialist, or a mental health addiction facility unless the physician is board-certified or board-eligible in pain management.
- Quality assurance program that includes the following components: the identification, investigation and analysis of the frequency and causes of adverse incidents to patients; the identification of trends or patterns of incidents; measures to correct, reduce, minimize, or eliminate the risk of adverse incidents to patients; the documentation of these functions; and periodic review at least quarterly of such information by the designated physician.

25. To date, Dr. Morgan has never had any patient overdose on the controlled substances that he has prescribed during his twenty (20) years of practice. He has maintained a strict medical practice with prescribing standards in compliance with all state and federal regulatory agencies, rarely even implementing telehealth services during the pandemic. **In fact, in past inspections and audits conducted by the DOH, the auditor redacted and photocopied certain records maintained by Dr. Morgan, for the purpose of utilizing them as an example and gold standard for other pain management clinics to emulate.**

<u>Communications with Walgreen Co.</u>

26. On or about June 20, 2024, Dr. Morgan received his first letter from Walgreens via FedEx stating that information about his prescribing practices was requested, and based on a failure to respond, Walgreens would discontinue dispensing controlled substance prescribed by him

starting August 16, 2024.  (See Exh. 2, Walgreens Letter dated June 18, 2024)  The letter further stated that:

> **"Team members at your local pharmacy had no role in making this decision and cannot make exceptions to this decision."** *(emphasis added)*

> "If your prescribing changes materially after the period of at least one year from the block effective date, contact us [ ] to request a review."

27. Dr. Morgan immediately contacted Walgreens via phone and email, advising that he has never received any previous communication from Walgreens requesting information. (See Exh. 3, Dr. Morgan's Letter dated June 20, 2024.)

28. In response, Walgreens sent a letter on or about June 25, 2024, to Dr. Morgan stating in part the following:

> "[O]ur nation faces an epidemic of prescription misuse, addiction, and diversion. While this issue concerns practicing providers who prescribe controlled substances, pharmacists have a corresponding responsibility to dispense controlled substances only in situations where there is a legitimate medical need."

> "A prescription for a controlled substance to be effective must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice. The responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner, but a corresponding responsibility rests with the pharmacist who fills the prescription."

This letter also requested information about Dr. Morgan and his medical practice. It was further stated that if no response was received by July 9, 2024, then Walgreens "may discontinue dispensing controlled substances" prescribed by Dr. Morgan as of August 16, 2024, and that this restriction would not affect the dispensing of non-controlled substances.  (See Exh. 4, Walgreens Letter dated June 25, 2024)

29. On July 4, 2024, Dr. Morgan provided his 56-page response inclusive of exhibits, which in part consisted of the information contained in this very pleading, in paragraphs 5-25.  (Exh. 5, Dr. Morgan's Letter dated July 4, 2024, including exhibits)

30. On or about July 16, 2024, Walgreens sent a letter to Dr. Morgan stating the following:

> "We have reviewed the materials you provided.  At this time, Walgreens has decided not to deviate from the dispensing decision as outlined in our letter dated June 18, 2024."

> "If your prescribing changes materially, please contact us after August 16, 2025 [ ] to request review."

> (See Exh. 6, Walgreens Letter dated July 16, 2024)

Walgreens affirmed that it would block Dr. Morgan's prescriptions for all controlled substances beginning August 16, 2024, for one full year, before he can request "review."

31. All correspondence to Dr. Morgan and his patients were signed by Walgreen Co.

**Usurpation of Pharmacists' Independent Judgment by Defendant Walgreens; and Prohibition of Pharmacist Compliance with Florida Board of Pharmacy's Professional Standards of Practice**

32. The Florida Board of Pharmacy regulates the professional conduct of pharmacists. Accordingly, standards of practice have been established specifically for the filling of controlled substance prescriptions. Pursuant to Florida Administrative Code 64B16-27.831:

> **"The Board of Pharmacy recognizes that it is important for the patients of the State of Florida to be able to fill valid prescriptions for controlled substances. In filling these prescriptions, the Board does not expect pharmacists to take any specific action beyond exercising sound professional judgment."**

33. Pharmacists are required to fill valid prescriptions. Therefore, the pharmacist's obligation is to exercise sound professional judgment in determining the validity of a prescription. **"A prescription is valid when it is based on a practitioner-patient relationship and when it has been issued for a legitimate medical purpose."** *Id.*

34. "Every patient's situation is unique and prescriptions for controlled substances shall be reviewed with each patient's unique situation in mind." *Id.* **"When validating a prescription, neither a person nor a licensee shall interfere with the exercise of the pharmacist's independent professional judgment."** *Id.*

35. Neither in conversation, nor in written communication, did Walgreens ever notify or inform Dr. Morgan of any specific patient prescription being in question or suspected of not being medically necessary, illegitimate, or otherwise problematic. Moreover, at no time has any individual pharmacist employed by or affiliated with Defendant Walgreens contacted, notified or otherwise questioned Dr. Morgan regarding the medical necessity and appropriateness of any prescriptions for controlled substances which he has prescribed for his patients. To the best of Dr. Morgan's knowledge, every prescription he has issued to Walgreens has been filled by Walgreens pharmacists. None of Dr. Morgan's prescriptions have been rejected by any Walgreens pharmacists as illegitimate, medically unnecessary, or otherwise questioned.

36. The prescriptions issued by Dr. Morgan are supported by medical necessity and fully adhere to all applicable state and federal legal guidelines and regulations regarding the prescribing of controlled substances, and Walgreens has produced nothing to suggest otherwise.

37. No pharmacist with Walgreens, or any other pharmacy, has contacted Dr. Morgan or the Hop Medical staff to question the medical necessity of the prescriptions, or otherwise question the compliance of his prescriptions with all applicable federal and state legal guidelines and clinical guidelines regarding the prescribing of controlled substances.

38. Defendant Walgreens has not provided any specific grounds or reasons for its actions of blocking its pharmacists from filling Dr. Morgan's prescriptions for controlled substances.

39. Despite these facts, Defendant Walgreens sent Dr. Morgan the July 11, 2024, letter, reaffirming its decision to block the filling of Dr. Morgan's prescriptions for controlled substances as of August 16, 2024. This was a corporate decision, where local pharmacists "cannot make exceptions." This means that as of August 16, 2024, Dr. Morgan is **blocked** in the Walgreens

electronic medical system thereby preventing any Walgreens pharmacists from being able to exercise independent judgment in filling his prescriptions.

**Injury and Harm to Current and Prospective Patients**

40. The action of Walgreens forces Dr. Morgan's patients to either continue under the care of a physician the patient has known for years and attempt to find a satisfactory alternative to Walgreens; or to continue as a patient of Walgreens and leave Dr. Morgan, the medical provider they have chosen to manage their chronic pain.

41. According to the 2022 U.S. Census Bureau, the populations of Palm Beach, Broward and Miami-Dade County are 1.518 million, 1.947 million and 2.674 million, respectively. According to the Florida DOH, Palm Beach, Broward and Miami-Dade County have 12, 17, and 17 licensed pain management clinics, respectively, excluding Hop Medical.  With a total of 46 licensed pain management clinics to service a total population of 6.139 million in the tri-county area, it is foreseeable that Dr. Morgan's patients will have difficulty obtaining timely care from another licensed pain management facility.

42. Furthermore, the Center for Disease Control (CDC) and Food and Drug Administration (FDA) warn against abrupt discontinuation of opioid medication, which can result in uncontrolled pain or withdrawal symptoms. Therefore, if a patient is unable to obtain another pain management healthcare provider prior to the depletion of their controlled substance medications, the patient will be in distress with foreseeable health liabilities. As a result, the patient may require urgent or emergency medical care.

43. Although Walgreens' communications indicated a general concern regarding the "epidemic of prescription misuse, addiction, and diversion," associated with opioids, Walgreens intends to block ***all*** of Dr. Morgan's controlled substance prescriptions, ***including non-opioid controlled***

13

*substances* as of August 16, 2024. Therefore, Dr. Morgan's patients who are treated with prescriptions for *non-opioid controlled substances* for other chronic medical issues such as epilepsy, androgen deficiency, chronic obstructive pulmonary disease (COPD), congestive heart failure (CHF), HIV/AIDS, obesity and other illness, are faced with the same dilemma of either finding another provider to manage their care or finding another pharmacy to fill their prescriptions for the non-opioid controlled substances.

44. In the event new patients present with issues requiring treatment with a non-opioid controlled substance, those patients, too, will also be forced to either seek medical consultation with another provider or find another pharmacy to fill their prescription for the non-opioid controlled substance. **This block on filling Dr. Morgan's non-opioid controlled substances will prevent patients from being treated for urgent medical conditions and or continuity of medical care requiring such treatment, which may be detrimental to patient health.**

45. Walgreens' actions unfairly, improperly and needlessly create a conundrum and a real and serious health risk for these patients.

46. The relationship between physician and patient is vital, but so too is that between a pharmacist and patient. It is even more important when a patient is taking opioid pain medications. Termination of that relationship places a harsh stigma on pain patients who may be labeled as "pharmacy shoppers" for switching pharmacies as a result of Walgreens' actions, and thereafter, treated with suspicion.[2]

47. As a result of Walgreens' action, significant stigma will be attached to Dr. Morgan's patients who must now face an inquiry as to why they switched pharmacies and or doctors, which may lead to undue profiling of the patient. Other pharmacies and or doctors will reject legitimate

---

[2] This concept was established by the DEA in its administrative proceedings to indicate a patient who has gone to more than one pharmacy in order to get a prescription filled.

pain patients due to this stigma, which will leave patients in distress when untreated for their chronic illnesses.

48. Walgreens' actions unfairly, improperly and needlessly cause a vulnerable population of legitimate pain patients to suffer unnecessarily.

49. Dr. Morgan currently treats over 100 patients who regularly fill their medications at Walgreens locations. Dr. Morgan also accepts new patients, in his discretion, who may choose to fill their medications at Walgreens often based on preference or insurance coverage. These patients will be harmed as a result of Walgreens' unjustifiable action against Dr. Morgan.

**Damage to Dr. Morgan's Medical Practice and Reputation**

50. The Walgreens June 19, 2024, letter sent to all of Dr. Morgan's patients stated that, "Based on an internal review, Walgreens has decided to no longer dispense controlled substance prescriptions from your prescriber Courtney Morgan, M.D." (See Exh. 7, Letter to Patients dated July 19, 2024[3]) The letter then informs patients that as of August 16, 2024, Walgreens would no longer fill Dr. Morgan's prescriptions for controlled substances. The contents of this letter necessarily imply a judgment or conclusion of Dr. Morgan prescribing controlled substances in a manner that is illegitimate, improper, illegal or otherwise not in keeping with standards of care, which is damaging to his professional reputation, medical practice and standing in the community.

51. Patients who are bound to Walgreens through their healthcare insurance will try to find another healthcare provider to manage their chronic pain and other medical issues. They are forced to leave Dr. Morgan, which otherwise would not occur but for Walgreens' action.

---

[3] Note that the letter referencing "internal review" was issued prior to Dr. Morgan's July 4, 2024, response, and therefore based on what can only consist of their database of prescriptions absent any application to a medical condition.

52. Walgreens' denial of care to Dr. Morgan's patients will have a domino effect and a substantial impact on his patients and his practice. Local pharmacies and large chain retailers will learn of Walgreens' decision and take similar action. Dr. Morgan's prescriptions will be refused at local pharmacies because of the stigma attached to Dr. Morgan and his practice as a result of Walgreens' decision to deny this type of care to his patients. Therefore, even patients who do not fill their medications at Walgreens will be impacted by the collateral effects of Walgreens' decision once local pharmacies learn of this action.

53. Dr. Morgan's practice has been largely built based on physician referrals, (i.e., PCPs, orthopedic/spine surgeons, neurosurgeons, etc.). Informing providers or new patients that Walgreens will not fill his prescriptions for *all controlled substances*, in and of itself implies a judgment or conclusion of Dr. Morgan prescribing controlled substances in a manner that is illegitimate, improper, illegal or otherwise not in keeping with standards of care, which is damaging to his professional reputation, medical practice, and standing in the medical community. Provider referrals will inevitably cease, and some prospective patients will not become patients if they cannot have their prescriptions filled at Walgreens.

54. Dr. Morgan has developed respectable, amicable and professional relationships with the Walgreens' pharmacists and is known for working together with them as a team, for the patient's medical care. The Walgreens electronic medical system has noted that Dr. Morgan's controlled substances will be blocked as of August 16, 2024, but non-controlled substances are not affected. Even the Walgreens pharmacists who Dr. Morgan have communicated with about mutual patients were surprised by his status in their system.  Nonetheless, this implies a judgment or conclusion of Dr. Morgan prescribing controlled substances in a manner that is

illegitimate, improper, illegal or otherwise not in keeping with standards of care, which is damaging to his professional reputation and standing in the medical community.

**Walgreens' Action is Unjustified and Results in the Improper Regulation of the Practice of Medicine**

55. Walgreens has a long and sordid history of settlements and judgments against it for its role in the Opioid Epidemic. To state a few, in 2013, Walgreens entered into a settlement with the DEA and agreed to pay $80 million in civil penalties, which was the largest settlement in DEA history at that time. In the 2022 *National Opioid Settlement*, Walgreens agreed to pay over $5.2 billion over 15 years.  In 2022, Walgreens also entered into an agreement with the State of Florida to pay $620 million over 18 years.

56. In order to stem its unlawful and non-compliant actions which resulted in the aforementioned settlements, Walgreens created its "Target Drug Good Faith Dispensing Policy" (TD GFD) around 2013. This policy targets three medications for mandatory review by pharmacists, to determine the validity of the prescription, to wit: whether a physician-patient relationship exists, and whether the prescription was issued for a legitimate medical purpose).

57. The procedures outlined in the TD GFD policies have been criticized by the American Medical Association (AMA), as the policies direct pharmacists to assess beyond the legitimacy of a prescription and into the realm medical management, which pharmacists are not qualified to do.  According to the AMA, pharmacists, "*under no circumstances should be required to confirm the appropriateness of a prescription; the decision is purely a medical one, completely in the purview of the treating physician*."[4]

58. Nonetheless, Dr. Morgan's communications with Walgreens pharmacists *pursuant their TD GFD review*, along with his submission of patient medical records, has always resulted in the

---

[4] https://www.thefdalawblog.com/2013/06/ama-tells-pharmacists-dont-call-us-well-call-you-/

dispensing of the same prescriptions by Walgreens pharmacists that the corporate office has now chosen to block.  **This further indicates that pharmacists' professional judgment is being superseded and redefined by Walgreens' unjustified corporate actions.**

59. Additionally, the July 11, 2024, Walgreens letter to Dr. Morgan stated that in order for this block to be removed, Dr. Morgan's would need to materially change his prescribing.  **This is an indisputable attempt by Walgreens' corporate office to medically manage patients, which is a direct violation of Florida's Administrative Rules for the practice of pharmacy.** Medical management of patient is performed by physicians, not pharmacists, much less a pharmacy's corporate office.

60. Furthermore, the June 19, 2024, letter to Dr. Morgan's patients, it was indicated that although Dr. Morgan's prescriptions for controlled substances would not be accepted starting August 16, 2024, and *all other prescriptions submitted by the patient's other providers would continue to be accepted.* Therefore, if these patients are prescribed the same medications by another provider for continuity of care, those prescriptions for controlled substances will be filled. Clearly, Walgreens has not, and cannot make a determination that the prescriptions issued by Dr. Morgan were not for a legitimate medical purpose.  Hence, there is no justification for Walgreens' action of blocking Dr. Morgan's prescriptions for controlled substances.

61. Walgreens intends to fill the same prescription for controlled substances for the same patient when issued by one physician, but not the other. This is tantamount to imposing a restriction on a Dr. Morgan's medical and prescribing licenses.

62. Walgreens is one of the largest drugstore chains in the United States. [5] In 2023, Walgreens filled approximately 800 million prescriptions.[6] It is tied to numerous major health insurance policies. Therefore, the effect of this block by Walgreens is far-reaching. If Walgreens is permitted to block Dr. Morgan's prescriptions, then his over 100 patients will not be able to receive adequate medical care, plus any prospective patient who has Walgreens as their pharmacy, for at least one full year. This is tantamount to imposing a restriction on Dr. Morgan's medical and prescribing licenses.

63. Moreover, if Dr. Morgan was to seek employment for a position as a primary care/family medicine physician, he would be an unemployable candidate with the inability to have prescriptions for **both opioid and non-opioid controlled substances** honored by Walgreens. **This restriction holds not only in the state of Florida, but throughout the nation.** Dr. Morgan is licensed in three (3) other U.S. jurisdictions, where he would also be unemployable because of Walgreens' action. This is tantamount to imposing a restriction on Dr. Morgan's medical and prescribing licenses.

64. Walgreens is not a federal, state, or local regulatory agency for the practice of medicine. It is not authorized to issue, restrict, impose discipline upon, or revoke medical licenses or DEA licenses. Dr. Morgan's medical and DEA licenses are current, unencumbered and not the subject of any disciplinary action. For the reasons described above, blocking Dr. Morgan's prescriptions for controlled substances is tantamount to imposing a restriction on his medical and prescribing licenses.

---

[5] https://www.walgreensbootsalliance.com/our-business/us-retail-pharmacy-segment, U.S. Retail Pharmacy Segment, August 31, 2023.
[6] *Id.*

<u>COUNT 1</u>
**TORTIOUS INTERFERANCE WITH A BUSINESS RELATIONSHIP**

For Plaintiff's cause of action against Defendant, Plaintiff re-alleges and adopts, as if fully set forth, the allegations contained in paragraphs 1-64, and would further state:

*Physician-Patient Relationship*

65. According to the American Medical Association ("AMA") Code of Ethics, an implied contract exists between patients and their physicians, which gives rise to physicians' ethical responsibility to place patients' welfare above the physician's own self-interest or obligations to others, and to use sound medical judgment on patients' behalf, and to advocate for their patients' welfare.

66. Defendant, a large national pharmacy chain, has knowledge of the sanctity of the relationship between a physician and patient and a pharmacist and patient.

*Current Pain Management Patients*

67. Defendant deliberately, intentionally, and improperly interfered with this relationship between Dr. Morgan and his patients by prohibiting its pharmacists from exercising their professional duty and discretion as pharmacists and instituting a corporate block to prohibit the filling of Dr. Morgan's valid prescriptions for all controlled substances.

68. Defendant deliberately, intentionally, and improperly interfered with Dr. Morgan's patient's ability to receive adequate treatment from him by prohibiting pharmacists from filling their valid prescriptions for all controlled substances issued by Dr. Morgan.

69. Defendant deliberately, intentionally, and improperly interfered with the relationship between Dr. Morgan and his patients who fill prescriptions at Walgreens and caused a breach of that relationship by refusing to honor his valid prescriptions issued for legitimate medical purposes.

70. Defendant's actions of blocking all of Dr. Morgan's prescriptions for controlled substances is unjustified. The same prescriptions blocked when issued by Dr. Morgan, can be filled when issued by another provider for the same patients at the same Walgreens pharmacy locations.

*Prospective Pain Management Patients*

71. Defendant has knowledge of and understands the fact physicians and medical practices often accept new patients continually.

72. Defendant deliberately, intentionally, and improperly interfered with anticipated relationships between Dr. Morgan and prospective patients by prohibiting its pharmacists from exercising their professional duty and discretion as pharmacists and instituting a corporate block to prohibit the filling of Dr. Morgan's prescriptions for all controlled substances.

73. Defendant deliberately, intentionally, and improperly interfered with Dr. Morgan's prospective patient's ability to receive adequate treatment from him by prohibiting pharmacists from filling their valid prescriptions for all controlled substances issued by Dr. Morgan.

74. Defendant deliberately, intentionally, and improperly interfered with the relationship between Dr. Morgan and his prospective patients who choose to fill prescriptions at Walgreens by preventing the establishment and development of that relationship by refusing to honor his valid prescriptions issued for a legitimate medical purpose.

75. Defendant's actions of blocking all of Dr. Morgan's prescriptions for controlled substances is unjustified. The same prescriptions blocked when issued by Dr. Morgan, can be filled when issued by another provider for the same patients at the same Walgreens pharmacy location.

*Primary Care Patients and Ability to Practice Medicine*

76. Defendant knows that Dr. Morgan is qualified to treat patients within the scope of family medicine. Defendant knows that the practice of family and primary care medicine encompasses,

in part, the prescribing of *non-opioid controlled substances*.

77. Defendant deliberately, intentionally, and improperly interfered with anticipated relationships between Dr. Morgan and prospective primary care patients by prohibiting its pharmacists from exercising their professional duty and discretion as pharmacists and instituting a corporate block to prohibit the filling of Dr. Morgan's prescriptions for *all controlled substances*.

78. Defendant deliberately, intentionally, and improperly interfered with Dr. Morgan's prospective primary care patient's ability to receive adequate treatment by prohibiting pharmacists from filling their valid prescriptions for *all controlled substances* issued by Dr. Morgan.

79. Defendant deliberately, intentionally, and improperly interfered with the relationship between Dr. Morgan and his prospective primary care patients who choose to fill prescriptions at Walgreens and thereby interfered with the establishment and development of that relationship by refusing valid prescriptions issued for a legitimate medical purpose.

80. Dr. Morgan is unemployable for any position as a family medicine or primary care physician (*i.e., urgent care centers, community health centers, family medicine physician groups, etc.*) as a physician whose prescriptions for controlled substances will not be honored by Walgreens. Medical facilities will not accommodate the logistics necessary to redirect patients to another provider or another pharmacy.

*Walgreens' Action is Unjustified*

81. Many of the patients affected by Walgreens' decision have been patients of Walgreens for an extended period of time, ranging from a few years, to upwards of 20 years. During this time, these patients have been prescribed the same or substantially same medication, which was filled by the Walgreens pharmacist. These patients will attest to the fact that they have been placed in this exact same predicament before, where a pharmacy stopped honoring their

physician's prescriptions. They were then forced to find another provider, where they undergo the same medical management and receive the same prescriptions for the same medication which was filled at their same pharmacy location.

82. Regardless of the foregoing, Defendant's actions imply that Dr. Morgan did something unlawful or improper, by Walgreens' refusal to honor his valid for all controlled substances.

83. In taking this action against Dr. Morgan, Defendant breached its own policies and violated Florida's Board of Pharmacy Rules by usurping the professional judgment of its own pharmacists and engaging in the unauthorized practice of pharmacy.

84. As a direct and proximate result of the Defendant's actions, Dr. Morgan and his clinic will suffer, as patients who choose to stay with Walgreens pharmacy will leave his practice; and other local pharmacies that follow suit and mirror Walgreens' action, will also cause additional patients to leave the practice.  The departure of patients from Dr. Morgan's practice and the limitations of accepting new patients who are not with Walgreens will contribute to the decline of Dr. Morgan's medical practice.

85. The Defendant's actions directly impact Dr. Morgan's reputation with his patients, prospective patients, medical providers in the community, local pharmacies, and regulatory agencies.  The reputation of Dr. Morgan and his clinic will be tarnished and damaged beyond repair.

86. As a direct and proximate result of Defendant's conduct, Dr. Morgan and his clinic will have suffered injuries, actual financial loss, and reputation damages in an amount that exceeds the jurisdictional minimum of this Court.

## COUNT 2
## INJUNCTIVE RELIEF

For Plaintiff's cause of action against Defendant, Plaintiff re-alleges and adopts, as if fully set forth, the allegations contained in paragraphs 1-86, and would further state:

87. Defendant intentionally engaged in the unlicensed practice of pharmacy by making a corporate decision to block Dr. Morgan's prescriptions for controlled substances, thereby prohibiting pharmacists from exercising their professional judgment in determining the validity of an individual prescription.  By doing so, Walgreens, without justification, has blocked the filling of Dr. Morgan's valid and legitimate patient prescriptions issued to treat medical conditions.

88. Walgreens recognizes that it is one of the nation's largest pharmacy chains, and accordingly, its decisions carry weight in the pharmacy community.

89. Walgreen's action to block Dr. Morgan's prescriptions for all controlled substances will become known to other pharmacies, medical professionals, regulatory agencies, and current and prospective patients.  Smaller pharmacies are certain to mirror Walgreen's decision due to stigmatization and fear of regulatory scrutiny.  Hence, those pharmacies will begin to refuse Dr. Morgan's legitimate prescriptions issued to its legitimate patient population based solely on Walgreens' unjustified decision to block all of Dr. Morgan's controlled substance prescriptions, absent a determination of issuance of an invalid prescription for any patient.

90. As a result, Dr. Morgan's patients will begin to have their prescriptions refused by local pharmacies regardless of their medical need.

91. Dr. Morgan's patients cannot simply go to another pharmacy. As a result of Defendant's unlawful and unjustified actions, his patients will be labeled as "pharmacy shoppers" and treated with suspicion. This concept was established by the DEA in its administrative proceedings, and it takes aggressive action up to and including registration suspension against

a pharmacy that fills prescriptions for patients who use multiple pharmacies or received prescriptions from physicians who are "red flagged."[7]

92. Stigma associated with pain patients and pain management providers in the United States is a real concern. In 2019, the United States Department of Health and Human Services (HHS) issued a report addressing the stigma that pain management patients face. HHS determined that "reducing barriers to care that exist as a consequence of stigmatization is crucial for patient engagement and treatment effectiveness." Walgreen's unjustified actions are directly contrary to HHS's direction to increase patient engagement and retard stigmatization.

93. Dr. Morgan, his clinic and his patients will carry stigma because of Walgreens' decision. Real patients with very serious medical issues will be denied treatment if Walgreens is permitted to continue to make corporate medical decisions that will impact patients suffering from pain.

94. Dr. Morgan will be successful on the merits of this action, as Walgreens' action was unjustified. Walgreens did not review a single patient medical record before summarily determining that Dr. Morgan's prescriptions did not serve a legitimate medical purpose. It did not speak with a single patient, nor isolate a single prescription as invalid.

95. Furthermore, many of the patients affected by Walgreens' decision have been patients of Walgreens for an extended period of time, ranging from a few years, to upwards of 20 years. During this time, these patients have been prescribed the same or substantially same medication, which was filled by the Walgreens pharmacist. These patients will attest to the fact that they have been placed in this exact same predicament before, where a pharmacy stopped honoring their physician's prescriptions. They were then forced to find another

---

[7] *See In Re Holiday CVS, LLC*, 77 Fed. Reg. 198 (2012) (Pharmacy license revoked where controlled substances were dispensed when physicians were red flagged and patients went to multiple pharmacies.).

provider, where they undergo the same medical management and receive the same prescriptions for the same medication which was filled at their same pharmacy location.

96. Walgreens' motivation for instituting blocks on physicians is likely an attempt to avoid the scrutiny it has underwent in the past with regulatory agencies.

97. There is no harm or injury to Walgreens for removing its corporate block from Dr. Morgan's profile and permit the filling of his prescriptions issued for all controlled substances, especially when Walgreens is willing to honor the same prescription if issued by another provider.

98. Dr. Morgan, his clinic and his patients will suffer irreparable injury if this Court does not act. Walgreens made a corporate decision that impacts the health of over 100 current patients of Dr. Morgan.  These patients have chronic pain resulting from various medical issues including but not limited to HIV/AIDS neuropathy, diabetic neuropathy, Crohn's Disease, various Cancers, quadriplegia, traumatic injuries, rheumatoid arthritis, limb deformities, spinal surgeries, radiculopathy/sciatica, plantar fascial fibromatosis, and amputations/phantom limb pain. A determination for continued treatment of chronic pain has already been made by other physicians. Therefore, the denial of necessary medical care, and specifically pain treatment for debilitating and severe medical conditions, is unjustified and will cause irreparable injury.

99. Patients whose physician-patient relationship is instantly severed by Walgreens will face immediate and debilitating pain and or withdrawal symptoms due to abrupt discontinuation of their medication regimen. Lack of available providers in the local area will cause patients to go without treatment causing further injury and exacerbation of their fragile medical conditions and or require patients to seek urgent or emergency medical care.

100.    Walgreens seeks to deny treatment of patients treated by Dr. Morgan without justification, thereby casting each patient into the parade of horrible symptoms and a chaotic scramble to

seek care with another medical provider or pharmacy.

101.    These patients will experience all of the pains and discomforts that come with denial of

legitimate medical care.  Accordingly, it is in the public's interest to enter Plaintiff's relief.

102.    Blanket prohibition on filling valid and legitimate prescriptions for controlled substances

issued by a pain management provider and family medicine doctor for over one full year will

cause Dr. Morgan to suffer irreparable severe injury to his reputation, business, and

professional employment status.  This will result in Dr. Morgan's inability to appropriately

treat patients within his scope of practice, lead to the deterioration, decline and ultimate demise

of his medical practice. This will also render him unemployable.

**WHEREFORE, Plaintiffs respectfully demand that:**

1.    Summons be issued to Defendant Walgreens;

2.    This Court enjoin Defendant Walgreens from instituting a corporate block on all of

Dr. Morgan's prescriptions for controlled substances;

3.    This Court award Plaintiff all costs of this action including reasonable attorney's fee; and

4.    This Court award Plaintiff compensatory damages, any and all other relief to which Plaintiff

may appear entitled.

Respectfully submitted,

/s/*Erica F. Chaplin*
Erica F. Chaplin, Esq.
FLBN: 0048023
Anderson & Welch, LLC
500 S. Australian Avenue, 6th Flr
West Palm Beach, FL 33401
Tel: 561-832-3386
Fax: 561-820-4867
Email: chaplinlaw@gmail.com
Email: andewelch@andersonandwelch.com
*Attorney for Plaintiff, Courtney R. Morgan, M.D.*

## VERIFICATION OF COURTNEY MORGAN, M.D.

I, Courtney Morgan, M.D. after being first duly sworn, state that I have read and reviewed the foregoing *Verified Complaint* and that the allegations contained therein are true and correct to the best of my knowledge and belief.

Dated: ___08/07/2024___

_____
Courtney Morgan, MD.

State of Florida
Broward County

The foregoing *Verification* was acknowledged, sworn to and subscribed to before me by Courtney Morgan, M.D. on this the 7th day of August, 2024.

_____
Notary Public, Florida
Notary Expiration Date: 10·17·2027

ANDREA R. WILLIAMS
Notary Public-State of Florida
Commission # HH 460069
My Commission Expires
October 17, 2027